UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
In re:

CNG Foods LLC,

                 Debtor.
-------------------------------------------------------------x

Case No. 16-43278-nhl

Chapter 7 (Involuntary)


## DECISION GRANTING MOTION TO DISMISS AND FOR SANCTIONS


APPEARANCES:


M. David Graubard
Kera & Graubard
71-18 Main Street
Flushing, NY 11367
*Attorneys for Alleged Debtor/Movant*

Barry R. Feerst & Associates
194 South 8th Street
Brooklyn, NY 11211
*Attorneys for Petitioning Creditors: Barry R.*
*Feerst & Associates, Baruch Aryeh Stern,*
*Eileen Prensky, and Isaac Shteierman*


HONORABLE NANCY HERSHEY LORD
UNITED STATES BANKRUPTCY JUDGE

## INTRODUCTION

Before the Court is the motion of CNG Foods LLC ("CNG" or the "Alleged Debtor")

seeking (i) dismissal of the involuntary bankruptcy case filed against it, and (ii) sanctions against

Barry R. Feerst individually ("Feerst"), and petitioning creditors Barry R. Feerst & Associates,

Eileen Prensky, Isaac Shteierman, and Baruch Aryeh Stern (the "Petitioning Creditors"), jointly

and individually, for all legal fees and expenses incurred by the Alleged Debtor with respect to the

involuntary case and for punitive damages pursuant to 11 U.S.C. § 303 and Rule 9011 of the

Federal Rules of Bankruptcy Procedure (the "Motion").[1]

The Court held an evidentiary hearing (the "Hearing") on this matter on six non-

consecutive days over several months.[2]  For the reasons set forth below, the Court finds that the

involuntary bankruptcy case must be dismissed because the Petitioning Creditors failed to properly

serve the summons and chose not to serve the supplemental summons on the Alleged Debtor.  The

Alleged Debtor is entitled to an award of attorneys' fees and costs pursuant to section 303(i)(1)

and, because the involuntary bankruptcy case was filed in bad faith, punitive damages pursuant to

section 303(i)(2).  The Alleged Debtor, however, is not entitled to sanctions pursuant to Rule 9011

because it failed to comply with requirements set forth in Rule 9011(c).

## JURISDICTION

This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b), and the

Eastern District of New York standing order of reference dated August 28, 1986, as amended by

order dated December 5, 2012. Consideration of this Motion is a core proceeding under 28 U.S.C.

---

[1] Unless otherwise indicated, all statutory references are to 11 U.S.C. §§ 1010 *et seq.* (the "Bankruptcy Code"), and references to rules are to the Federal Rules of Bankruptcy Procedure (the "Rules").

[2] References to the transcripts of the Hearing are identified as follows: "Day 1 Tr." [ECF No. 29], "Day 2 Tr." [ECF No. 37], "Day 3 Tr." [ECF No. 41], "Day 4 Tr." [ECF No. 56], "Day 5 Tr." [ECF No. 54] and "Day 6 Tr." [ECF No. 62]. Citations to "ECF No. __" are to documents filed in Case No. 16-43278-nhl, identified by docket entry number.

§ 157(b)(2)(A) and (O).  This decision constitutes the Court's findings of fact and conclusions of law to the extent required by Federal Rule of Bankruptcy Procedure 7052.

## BACKGROUND

This matter arises from the involuntary chapter 7 case commenced against the Alleged Debtor, a Mexican Kosher restaurant, by the filing of an involuntary petition (as amended, the "<u>Petition</u>") just one day before a scheduled state court hearing (the "<u>Petition Date</u>") regarding whether certain individuals, including two of the four Petitioning Creditors, were to be held in contempt of court for actions taken against the Alleged Debtor's principal (the "<u>Contempt Hearing</u>").[3] A/D's Ex. 9.

I.    <u>The Parties and Their Claims</u>

Deena Zaitschek a/k/a Faiga Deena Fogel ("<u>Fogel</u>") purports to be the sole member, manager and owner of CNG (also referred to as "<u>Carlos and Gabby's</u>"), a restaurant she allegedly operated for over six years. Day 1 Tr. 38:3-12, 77:5-6; Mot. ¶¶ 1, 5, ECF No. 4.  Fogel was called as a witness by the Alleged Debtor.

David Zaitschek, Fogel's spouse during the time that she allegedly operated CNG,[4] was somewhat involved in the management of CNG, but the extent and nature of his involvement is unclear based on the testimony and evidence submitted at trial. *See* Day 2 Tr. 93:11-22.  The Petitioning Creditors suggested that David Zaitschek was, at some point, authorized to operate the premises and was involved in operating the business. *See* F's Second Opp. ¶ 2, ECF No. 20; *see also* Day 2 Tr. 93:11-22, 99:9-15; F's Ex. A.  Fogel and the Alleged Debtor assert that David

---

[3] The following facts are drawn from the official docket of the bankruptcy court (the "<u>Case Docket</u>"), testimony given at the Hearing, exhibits admitted into evidence, and documents entered on the Case Docket to which the Court has taken judicial notice.

[4] Mot. ¶ 5, ECF No. 4. At the Hearing, Fogel referred to David Zaitschek as her "soon-to-be ex-husband." Day 2 Tr. 93:24.

Zaitschek was involved in attempts to take control of CNG away from Fogel. Mot. ¶ 7, ECF No. 4 ("David, together with his cohort Ari Stern . . . and their counsel Barry R. Feerst . . . , made an application . . . to preliminarily enjoin [Fogel] from entering the Restaurant . . . ."). Fogel testified that David Zaitschek also created a corporation called CNG Brooklyn, Inc. to take the business away from her. Day 2 Tr. 33:11-16; *see* A/D's Ex. 11.

Petitioning Creditor Barry R. Feerst & Associates (hereinafter referred to as "<u>Feerst & Associates</u>") is a law firm that appeared as attorneys for CNG in a state court action against Fogel[5] in New York Supreme Court, Kings County index number 3322/2016 before Justice Sylvia Ash (the "<u>State Court Action</u>"). A/D's Ex. 12.[6]  According to the Petition, Feerst & Associates asserted a claim of $10,745 against the Alleged Debtor for "services rendered." Pet., ECF No. 1.

In addition to signing the Petition as counsel to Feerst & Associates, Feerst also, according to the Case Docket, appeared as counsel of record to each of the Petitioning Creditors.[7] Throughout the evidentiary proceedings, Feerst also purported to appear as "attorney pro se creditor" or "pro se petitioning creditor," and at one point clarified that he was appearing on behalf of Feerst & Associates, pro se. Day 1 Tr. 3:6; Day 2 Tr. 95:1-11; Day 3 Tr. 20:20-22, 21:5-22. The Court ultimately held a hearing on this issue and entered an order thereafter, finding that "Barry

---

[5] In addition to representing CNG in the State Court Action prior to the filing of the Petition, Feerst also represented a company called "Jewmex" (also referred to as "Jumex") in litigation in Nassau County in an action filed *against* CNG. *See* Day 5 Tr. 94:7-15.  Feerst has also represented Adam Kay, CNG's corporate franchisor "in excess of four or five years." Day 5 Tr. 60:5-9.  At the Hearing, the Court questioned whether Feerst's simultaneous representation of the corporate franchisor (i.e., Adam Kay) and the corporate franchisee (i.e., CNG) was an "ethical problem." Day 1 Tr. 30:6-8, 29:19-25.

[6] This Court took judicial notice of A/D's Ex. 12.

[7] In addition to Feerst, another attorney from Feerst & Associates, Yitzchok Kotkes ("<u>Kotkes</u>"), appeared on behalf of Feerst & Associates and Feerst. Kotkes appeared at (i) a hearing prior to the evidentiary proceedings as "Yitzchok Kotkes from the Law Offices of Barry R. Feerst & Associates on behalf of the petitioning creditors," Adjourned OSC Hearing Tr. 2:14-16; (ii) day five of the Hearing as "Yitzchok Kotkes for Barry Feerst," Day 5 Tr. 4:7; and (iii) day six of the Hearing as "Yitzchok Kotkes, counsel for Barry R. Feerst," Day 6 Tr. 3:6-7.

R. Feerst & Associates is the attorney of record for the Petitioning Creditors as originally filed in the above-captioned case." ECF No. 44.[8]  Feerst was called as a witness by the Alleged Debtor and gave testimony.

Petitioning Creditor Isaac Shteierman was allegedly retained by Fogel and her estranged husband to help with CNG's finances. Day 1 Tr. 43:8-12.  Shteierman asserted a claim in the amount of $11,000 for "loans." Pet., ECF No. 1. While Shteierman signed the Petition, he was not called as a witness.

Petitioning Creditor Baruch Aryeh Stern was allegedly retained by Isaac Shteierman to "help the business" and manage the restaurant. Day 1 Tr. 40:22-23; Day 5 Tr. 23:1-3.  Stern asserted a claim for wages in the amount of $6,879. Pet., ECF No. 1. Stern was called as a witness by the Alleged Debtor.

Petitioning Creditor Eileen Prensky was a friend of Fogel's. Day 1 Tr. 66:22-23. Prensky asserted a claim in the amount of $100,000 for "loans." Pet., ECF No. 1.  Prensky was not called as a witness and did not speak on the record at the Hearing.

Adam Kay is allegedly the franchisor of Carlos and Gabby's and owns the trademark on that name. Day 5 Tr. 43:15-17.  Kay was called as a witness by the Alleged Debtor.

II.    The State Court Action[9]

Prior to the Petition Date, CNG, represented by Feerst & Associates, commenced the State Court Action by filing a Summons with Notice. A/D's Ex. 12;[10] Mot. ¶ 8, ECF No. 4. Feerst

---

[8] The Court also entered an *Order Denying Application of Barry R. Feerst & Associates for Reconsideration by Order to Show Cause*, denying the application filed by Feerst, on behalf of Feerst & Associates, seeking entry of an order to correct the docket sheet in the instant case and to reconsider the Court's determination that Feerst & Associates is counsel of record for the Petitioning Creditors. ECF No. 53.

[9] This section sets forth a synopsis of the proceedings in state court, highlighting the relevant facts solely as they relate to the filing of the Petition.

[10] This Court took judicial notice of A/D's Ex 12.

testified that Shteierman hired him to represent CNG in the State Court Action, and was his client contact throughout the case. Day 5 Tr. 93:5-13.

According to Fogel, she was never served with the Summons and Notice. Mot. ¶ 9, ECF No. 4.  Two days after commencement of the State Court Action, CNG sought to preliminarily enjoin her from entering CNG's business premises. *Id.* ¶ 7, Ex. C.  Justice Ash signed an order to show cause (the "First OSC"), scheduling a hearing and temporarily enjoining Fogel from entering CNG's premises pending the hearing.  *Id.* ¶ 10, Ex. C. Shortly thereafter, that temporary injunction was lifted and the First OSC vacated in response to Fogel's attorney obtaining an order to show cause (the "Second OSC"). *Id.* ¶ 10, Ex. D.  The Second OSC temporarily enjoined and restrained Stern, David Zaitschek, and Shteierman, and any of their representatives, from entering the CNG premises pending a hearing. *Id.* Less than a week later, Feerst filed an emergency affirmation seeking to stay Fogel from entering the restaurant premises, asserting that Fogel was "about to empty CNG's bank accounts, destroy the viability of CNG, misappropriate CNG's business and endanger termination of the License Agreement."[11] *Id.* ¶ 13, Ex. F.  Justice Ash executed that order to show cause (the "Third OSC") but denied the interim relief requested by Feerst. *Id.* The hearing on the Third OSC resulted in an order denying Feerst's application in all respects. *Id.* ¶ 13–14.

Justice Ash then granted the relief sought in the Second OSC in part and ordered CNG and its representatives, among other things, to restore Fogel's access to the premises, provide Fogel with keys to any changed locks and passwords to all business accounts, and otherwise restore the status quo prior to the First OSC (the "Access Restoration Order"). *Id.* ¶ 14, Ex. G; A/D's Ex. 23-3.  After David Zaitschek, Stern, and Shteierman allegedly failed to comply with the Access Restoration Order, Judge Ash signed an order to show cause (the "Contempt OSC"), scheduling

---

[11] The "License Agreement" refers to an agreement between CNG and Adam Kay.  *See* A/D's Ex. 7, 8.

the Contempt Hearing to determine whether, *inter alia*, CNG, and more specifically, Stern, Kay, David Zaitschek, Shteierman, and any and all of their representatives (the "CNG Representatives") were in "contempt of, violation of, and non-compliance" of the Access Restoration Order.[12] A/D's Ex. 9; Mot. ¶ 15, ECF No. 4. Thereafter, the State Court Action was dismissed with the Contempt OSC ordered to survive the dismissal. A/D's Ex. 10.

III.    The Involuntary Case

One day prior to the scheduled Contempt Hearing, the Petitioning Creditors filed the first involuntary petition, thereby invoking the automatic stay.[13] Pet., ECF No. 1.  Shortly thereafter, the Alleged Debtor filed the instant Motion seeking dismissal of the Petition and sanctions, asserting, *inter alia*, that (1) the involuntary summons and Petition were not timely or properly served on the Alleged Debtor, (2) none of the Petitioning Creditors are bona fide creditors of the Alleged Debtor, and (3) the Petition was filed in bad faith as a litigation tactic. *See* Mot., ECF No. 4.

Approximately two months after the Petition Date, this Court entered an order directing the Petitioning Creditors to appear and show cause as to why an order should not be entered dismissing the Petition for lack of prosecution (the "Court's OSC"), as the docket did not reflect an affidavit of service evidencing service of the Petition on the Alleged Debtor. ECF No. 6.  Three weeks later, the Petitioning Creditors filed an affidavit of service indicating that they served the

---

[12] Pursuant to the Contempt OSC, CNG was to also show cause why an order should not be entered (i) directing the CNG Representatives to pay Fogel's attorneys' fees in the amount of not less than $750; (ii) directing the CNG Representatives to pay Fogel $10,000 per day for any violation of the Access Restoration Order; and (iii) sanctioning the CNG Representatives for any and all legal fees and costs suffered by Fogel. A/D's Ex. 9.

[13] The first petition contained improper electronic signatures of each Petitioning Creditor (i.e., signed "/S/" for each Petitioning Creditor) and by Feerst as counsel to Petitioning Creditor Feerst & Associates. Pet., ECF No. 1. Two days later, Feerst, on behalf of Feerst & Associates, filed an amended petition, including corrected electronic signatures for each Petitioning Creditor and himself. Amend. Pet., ECF No. 2.

Summons on the Alleged Debtor thirty-four days after the filing.  Inv. Summ., ECF No. 3; Aff. of Serv. Summ., ECF No. 8.

Feerst, purportedly on behalf of Feerst & Associates as a "pro se creditor," and with the support of the other Petitioning Creditors, filed "opposition to Debtor's order to show cause" asserting, *inter alia*, that service of the summons was proper and the Motion should be denied. Feerst Opp., ECF No. 9.[14]

The hearing on the Court's OSC (the "<u>OSC Hearing</u>") resulted in a finding that service of the summons was invalid because it was not served within seven days of it being issued as required under Rule 7004(e). OSC Hearing Tr. 2:15-3:10[15] ("The summons you served was ineffective . . . because it was stale.").  At the OSC Hearing, Feerst informed the Court that he attempted to resolve the case by suggesting to the Alleged Debtor that the case be dismissed without prejudice; however, the parties were unable to agree on the terms of dismissal. *See id.* at 4:3-7, 7:3-24. Counsel to the Alleged Debtor then informed the Court that it wished to proceed with the Motion seeking sanctions. *See id.* at 7:21-25.

At the OSC Hearing, Feerst also requested an order lifting the stay so he could "go back to state court and deal with the contempt [motion]." *Id.* 8:11-15.  Counsel to the Alleged Debtor argued that the stay did not apply because the Alleged Debtor was the named plaintiff in the State Court Action.  *Id.* at 9:22-25. In response, the Court confirmed "there is no stay." *Id.* at 10:10-13.

The Court advised that the Petitioning Creditors had time to effectuate proper service if they obtained a supplemental summons from the Clerk of the Court, stating:

> You can do that in which case then [the Alleged Debtor has] to answer and we
> determine whether we have a contested involuntary. If [the Alleged Debtor]
> agree[s] to dismiss it that's fine. If you don't agree to dismiss it because [the

---

[14] The Alleged Debtor filed a reply thereto in support of its Motion. Reply, ECF No. 11.

[15] References to the transcripts of the OSC Hearing are identified as follows: "OSC Hearing Tr." [ECF No. 27].

Alleged Debtor] feels that [it] want[s] to press for sanctions then I'm going to adjourn today's hearing.

*Id.* at 9:6-11. One day later, a Supplemental Involuntary Summons was issued, evidently at the request of Feerst and/or the Petitioning Creditors, but it was never served. Suppl. Summ., ECF No. 12.

After the OSC Hearing, the Alleged Debtor filed a Supplemental Affirmation in Support of the Motion. Suppl. Aff., ECF No. 13.  Feerst responded, disputing the contention that the Petition was filed in bad faith to stay the Contempt Hearing, and contesting the Alleged Debtor's request for sanctions. Resp. to Suppl. Decl., ECF No. 15.[16]

At an adjourned hearing on the OSC and the Motion (the "<u>Adjourned OSC Hearing</u>"), Kotkes, on behalf of Feerst & Associates, did not oppose dismissal of the involuntary case, acknowledging that the summons was never served. Adjourned OSC Hearing Tr. 3:4, 3:12-15,

---

[16] In Feerst's Declaration in Response to Debtor's Supplemental Certification, Feerst alleges that the "petitioning creditors appeared and were ready to oppose the contempt claims that were filed by the Debtor in the State Court action" on the date of the scheduled Contempt Hearing. Resp. to Suppl. Decl. ¶ 5, ECF No. 15.  Feerst asserts that "[t]he matter was adjourned because <u>the Debtor was not ready to proceed</u>" and that this "destroys Debtor's baseless allegation that the . . . Petition was filed in bad faith as a way to avoid the State Court action." *Id.* at 5–8.  In response, the Alleged Debtor asserted that Feerst's argument is a "red herring" and explained that the date Feerst was referring to was in fact a "regular calendar date." Suppl. Reply ¶ 4–6, ECF No. 16. The Alleged Debtor clarified that, contrary to Feerst's assertions, the hearing on the Contempt OSC in state court had not yet been held. *Id.*

Thereafter, counsel to the Alleged Debtor stated that the Petitioning Creditors' "argument in the state court the next day was to get [the contempt hearing] adjourned because of the automatic stay" and that the state court did, in fact, "stop[] the proceeding." Adjourned OSC Hearing Tr. 6:1-2, 6:23-24.  In response, Kotkes, on behalf of Feerst & Associates, reiterated its position—that they appeared at the hearing, but that Fogel did not. *Id.* at 7:5-11. The Court then highlighted that Kotkes was referring to the wrong court date (i.e., not the hearing scheduled for the day after the filing of the Petition, but a court date that occurred approximately four months thereafter). *See id.* at 8:12-14. Kotkes' response did not address this misunderstanding. *See id.* at 8:15-25. Counsel to the Alleged Debtor again asserted that "they came in and argued that the contempt hearing . . . had to be adjourned because of the bankruptcy." *Id.* at 9:22-24. Later, Feerst testified that "I don't know what occurred [the day after the Petition was filed] except that for sure the case was adjourned because the docket reflects that. We sent in a per diem to be there for the calendar call." Day 6 Tr. 58: 18-21.  When asked what instructions were given to the per diem, Feerst testified "[g]o to court and report to us what occurs." *Id.* at 60:10.

11:2-4.[17]  He asserted that the Court had no jurisdiction to entertain the Alleged Debtor's request for sanctions. *See id.* 3:12-15.

The contested Motion proceeded to an evidentiary hearing, with the Alleged Debtor's case in chief consisting of testimony from Fogel, Stern, Kay, and Feerst and various exhibits.  The Petitioning Creditors did not call any witnesses.  The parties submitted post-hearing briefs in lieu of closing arguments. ECF Nos. 64, 65.

According to Fogel, the Petition was "filed as part of a scheme to try to steal CNG." Mot. ¶ 6, ECF No. 4.  Feerst testified that the signing and filing of the Petition was necessary to protect the creditors from Fogel seizing CNG's assets by way of her contempt motion, "to stop [Fogel] from stealing the company . . . and prevent[] her from being awarded the million bucks she was seeking in contempt fines." Day 6 Tr. 88:3-16, 57:16-19.  He also testified that the filing of the Petition was the Petitioning Creditors' attempt to cause Fogel to "straighten out the operation, especially to the satisfaction of Kay who was the key player in the whole deal."[18] *Id.* at 63:4-9.

Feerst also conceded that he believed the filing of the Petition would stay the Contempt Hearing and strongly indicated that the purpose of the filing was to do just that. *See id.* at 92:4-14. When asked how filing the Petition would protect against Fogel seizing CNG's assets, Feerst responded "[s]he stops. She can't do it." *Id.* at 88:3-16. When asked whether it was his belief that the Petition "would stay the contempt motion because it was against CNG," Feerst replied "[y]es." *Id.* at 92:4-9; 91:9-24.

---

[17] References to the transcripts of the Adjourned OSC Hearing are identified as follows: "Adjourned OSC Hearing Tr." [ECF No. 28].

[18] Kay is not a creditor of the Alleged Debtor. Feerst testified that Kay is "[n]ot a creditor, but had a real interest in having the matter resolved in a way that preserved his company, preserved his name." Day 6 Tr. 66:17-19.

The facts surrounding the preparation and filing of the Petition are unclear. According to Feerst, he had no written agreement with any of the Petitioning Creditors with respect to the preparation, execution, and filing of the Petition. Day 2 Tr. 9:5-7. Feerst also represented that "no documents [were] held by [him], examined by [him], reviewed by [him], [or] ever given to [him] on behalf of these petitioning creditors." *Id.* at 10:4-7. Although he received no supporting documentation with respect to the Petitioning Creditors' claims, Feerst testified to preparing some of the Petition:

> Q: And who prepared this?
> FEERST: I did. Well, not all of it. I prepared some of it.

Day 5 Tr. 86:13-14; *see* Day 6 Tr. 6:4-7, 23-25. He also testified that an employee of Feerst & Associates prepared page three of the Petition, which lists the Petitioning Creditors' names and claim amounts. Day 5 Tr. 86:10-87:4.

Despite his testimony that it was the Petitioning Creditors' idea to file the Petition, Feerst testified that he merely "believe[s]" that he spoke with each Petitioning Creditor with respect to the filing of Petition, except he was not certain whether he spoke to Stern. Day 6 Tr. 55:17-18, 56: 8-12, 57:9-13. Stern testified that he never spoke to Feerst about the Petition and that no one ever spoke to him regarding what information should be included in it. Day 5 Tr. 29:24-30:1, 30:17-22. Stern acknowledged during his testimony that the Petition was presented to him by Shteierman, who convinced Stern that Fogel owed Shteierman money. *Id.* at 28:25, 29:17-19. Stern also testified that Shteierman "rushed" him into signing the Petition, and that Shteierman said that signing the Petition would "be a way to get back into the business." *Id.* at 33:22, 34:2-4, 29:6. Neither Prensky nor Shteierman presented evidence with respect to the signing of the Petition, as they did not testify at the Hearing.

The merits of each of the Petitioning Creditors' claims were contested at the Hearing. Stern testified that the $6,879 wage claim listed on the Petition to support his status as a petitioning creditor did not, in fact, exist. *Id.* at 30:11-16. Feerst testified that his asserted $10,745 claim represented the unpaid balance owed him for legal work he performed on behalf of CNG in the State Court Action, but conceded that there was no written agreement evidencing such claim. *Id.* at 91:21-25. The only document submitted in support of Prensky's $100,000 claim was a check in the amount of $95,930 endorsed by Prensky. *Id.* at 89:19-25. According to Fogel, this check was intended by Prensky to be invested in a Carlos and Gaby's restaurant that Fogel planned on opening in Teaneck, New Jersey. Day 1 Tr. 67:3-9, 67:25; Day 3 Tr. 45:2-16. Accordingly, Prensky's check was not deposited into a CNG account but rather into a checking account specifically related to the Teaneck location. Day 2 Tr. 46:19-22, 46:10. No evidence was submitted in support of Shteierman's asserted $11,000 claim for loans and, to the contrary, Fogel testified that Shteierman never loaned any money to CNG. Day 1 Tr. 47:11-19.

IV.        Parties' Contentions

The Alleged Debtor argues that the case should be dismissed because (i) the Petition was not timely or properly served on the Alleged Debtor, and (ii) the claims of the four Petitioning Creditors were subject to a bona fide dispute. *See* Mot. ¶ 18–27, ECF No. 4. With respect to the request for sanctions, the Alleged Debtor contends that sanctions under 11 U.S.C. § 303 and Rule 9011 in the form of attorneys' fees, expenses, and punitive damages are appropriate, asserting that the filing of the Petition was an act of bad faith, intended to harass the Alleged Debtor and Fogel, and to delay or halt the Contempt Hearing. *Id.* ¶ 32.

Feerst contends that the Petition was filed to "protect CNG's business from the actions and misconduct" of Fogel. F's Closing at 1, ECF No. 64. Feerst contests the Alleged Debtor's

claim that the filing was a litigation tactic, highlighting that the filing did not in fact stay the Contempt Hearing. *Id.* at 4. Feerst also asserts that, without a bad faith finding, there is no basis to award sanctions or legal fees since the Petitioning Creditors consented to dismissal of the case. *Id.* at 5. The Alleged Debtor rebuts this argument on the basis that Feerst & Associates opposed the Motion. A/D's Closing ¶ 16, ECF No. 65.

## DISCUSSION

The Court finds that the Petition must be dismissed because the Petitioning Creditors failed to timely serve the Summons and never served the Supplemental Summons on the Alleged Debtor. The Alleged Debtor is entitled to an award of attorneys' fees and costs pursuant to section 303(i)(1) and, because the Petition was filed in bad faith, punitive damages pursuant to section 303(i)(2). The Alleged Debtor, however, is not entitled to sanctions pursuant to Rule 9011 because it failed to comply with the procedural requirements of Rule 9011(c).

I.    <u>Dismissal of the Petition</u>

Section 303(j) of the Bankruptcy Code provides that "[o]nly after notice to all creditors and a hearing may the court dismiss a petition filed under this section— . . . (3) for want of prosecution." 11 U.S.C. § 303(j). Pursuant to Rule 1010, upon the filing of an involuntary petition, the clerk shall issue a summons for service, which shall be made on the debtor. Service of the summons and involuntary petition must be made within seven days of issuance of the summons. Fed. R. Bankr. P. 7004(e). Further, the E.D.N.Y. Local Bankruptcy Rules provide that "[t]he Court may dismiss the case if proof of service of the summons and involuntary petition pursuant to Bankruptcy Rule 7004 is not timely filed." E.D.N.Y. LBR 1013-1(c).

Here, the Petitioning Creditors did not serve the involuntary summons within the required seven days after its issuance. *See* Inv. Summ., ECF No. 3; *see also* Aff. of Serv. Summ., ECF No.

8.    While Feerst eventually obtained a supplemental summons from the Clerk of Court, the Petitioning Creditors admittedly never served it on the Alleged Debtor.  Adjourned OSC Hearing Tr. 3:4, 3:12-15, 11:2-4.  Accordingly, because the Alleged Debtor was not properly served, the Court finds that this case must be dismissed.[19]

II.    <u>11 U.S.C. § 303(i) Award</u>

    **A.    Legal Standard**

Section 303(i) of the Bankruptcy Code provides:

> If the court dismisses a petition under this section ***other than on consent*** of all petitioners and the debtor, and if the debtor does not waive the right to judgment under this subsection, the court ***may*** grant judgment—
>> (1) against the petitioners and in favor of the debtor for—
>>> (A) costs; or
>>> (B) a reasonable attorney's fee; or
>> (2) against any petitioner that filed the petition in bad faith, for—
>>> (A) any damages proximately caused by such filing; or
>>> (B) punitive damages.

11 U.S.C. § 303(i) (emphasis added).

The Bankruptcy Court has discretion to grant an award pursuant to § 303(i). *In re Anmuth Holdings LLC*, 600 B.R. 168, 184 (Bankr. E.D.N.Y. 2019) ("It is settled law that an award under § 303(i) is within the discretion of the Bankruptcy Court.").

---

[19] The Alleged Debtor asserts that the case should also be dismissed because all four claims asserted in the involuntary petition are subject to a bona fide dispute. Mot. ¶ 18–27, 36–37, ECF No. 4.  Section 303(b) of the Code provides:

> An involuntary case against a person is commenced by the filing with the bankruptcy court of a petition under chapter 7 or 11 of this title—
>> (1)  by three or more entities, each of which is either a holder of a claim against such person ***that is not contingent as to liability or the subject of a bona fide dispute*** as to liability or amount . . . .

11 U.S.C. § 303(b) (emphasis added). Because of the service failure, the Court need not determine whether each Petitioning Creditor had a claim that was subject to a bona fide dispute in order to dismiss this case. However, the Court will discuss the validity of the Petitioning Creditors' claims with respect to whether the Petitioning Creditors filed the Petition in bad faith.

The Petitioning Creditors' argument that the Court has no jurisdiction to sanction under 303(i)—because the Court had no choice but to dismiss the case due to the Petitioning Creditors' failure to serve the Petition—is without merit.  The Bankruptcy Code explicitly gives bankruptcy courts the power to sanction petitioning creditors after an involuntary case is dismissed. *See* 11 U.S.C. § 303(i); *see e.g.*, *In re Forever Green Athletic Fields, Inc.*, 804 F.3d 328, 334 (3d Cir. 2015) ("Section 303(i)(2) allows a bankruptcy court to award damages following dismissal against 'any petitioner that filed the petition in bad faith.'")*; In re Palmer*, No. 50 8-16-71186-reg, slip op. at 1 (Bankr. E.D.N.Y. June 22, 2017), https://www.nyeb.uscourts.gov/sites/nyeb/files/opinions/Opinion_reg-2017-06-22.pdf ("Because this is an involuntary petition, dismissal does not end the process."); *Nat'l Med. Imaging, LLC v. U.S. Bank, N.A. (In re Nat'l Med. Imaging, LLC)*, 570 B.R. 147, 156 (Bankr. E.D. Pa. 2017) ("[B]ankruptcy courts clearly retain jurisdiction to consider awarding a putative debtor section 303(i) damages after the court dismisses the involuntary petition.").

Further, bankruptcy courts have sanctioned petitioning creditors under section 303(i) where petitioning creditors failed to properly serve the involuntary petition on the alleged debtor. *In re Grossinger*, 268 B.R. 386, 388 (Bankr. S.D.N.Y. 2001) (finding that the petitioning creditor acted in bad faith and noting several indicia of bad faith, including "failing to serve the alleged debtor"); *In re Stern*, 268 B.R. 390, 391 (Bankr. S.D.N.Y. 2001) (sanctioning the petitioning creditors and noting that, where the petitioning creditors failed to serve a copy of the petition on the alleged debtor and the failed to prosecute the case, "[s]uch inactivity gives rise to a powerful inference of bad faith"); *In re Johnston Hawks, Ltd.*, 72 B.R. 351, 367 (Bankr. D. Haw. 1987) (sanctioning the petitioning creditors after finding that the petition was filed in bad faith based on

the "collective actions" of the petitioning creditors, including the petitioning creditors' failure to serve the alleged debtors).

**B.      Dismissal Not "On Consent"**

A court may grant an award pursuant to section 303(i) if the following three conditions are met: "(1) the court must have dismissed the involuntary petition; (2) the dismissal must be other than on consent of the petitioning creditors and the debtor; and (3) the debtor must not have waived its right to recovery under the statute." *In re Anmuth*, 600 B.R. at 184 (citing *R. Eric Peterson Constr. Co. v. Quintek, Inc. (In re R. Eric Peterson Constr. Co.)*, 951 F.2d 1175, 1179 (10th Cir. 1991)).

Here, the first and third elements are not in dispute. As noted above, the Court, by this decision, is dismissing the involuntary petition. Further, there is no contention that the Alleged Debtor waived its right to judgment under section 303(i). The second element—whether the dismissal was on consent—is disputed, as the Petitioning Creditors assert that their consent to dismissal precludes an award under either subsection of § 303(i). The Court disagrees.

*1.      The Alleged Debtor expressly reserved its right to judgment under section 303.*

With respect to whether dismissal is "on consent" so as to preclude an award under section 303(i), "[c]ourts differ as to whether a debtor's ***express non-waiver*** of a right to a judgment under § 303(i) necessarily ***qualifies its consent*** to dismissal." *In re Anmuth*, 600 B.R. at 185 (emphasis added). *Compare In re Tichy Elec. Co.*, 332 B.R. 364, 375 (Bankr. N.D. Iowa 2005) (finding that the debtor did not consent to dismissal because it reserved its right to assert a claim under § 303(i)), *with In re Int'l Mobile Advert. Corp.*, No. 90-11369S, 1991 WL 156588, at *1–2 (E.D. Pa. Aug. 13, 1991) (finding that dismissal was on consent, despite debtor's express non-waiver of its rights to damages).  This Court recently found that dismissal was not on consent where the alleged

debtors "[a]t every stage . . .  expressly reserved their rights to pursue § 303(i) damages." *In re Anmuth*, 600 B.R. at 186; *accord In re Express Car & Truck Rental, Inc.*, 440 B.R. 422, 431 (Bankr. E.D. Pa. 2010) ("[O]nce a debtor reserves the right to seek damages under § 303(i), that reservation qualifies the debtor's consent and therefore, the dismissal of the case is *not* 'on consent of *all* petitioners *and* the debtor.'" (quoting *In re R. Eric Peterson Constr. Co.*, 951 F.2d at 1180)).

Here, the Alleged Debtor, in its Motion, immediately sought both dismissal and damages pursuant to section 303(i). Mot., ECF No. 4. It expressly reserved its rights to pursue damages pursuant to section 303(i) again at the OSC Hearing and in various pleadings filed throughout this case. *See* OSC Hearing Tr. 7:16-18, 7:21-24; *see also* Suppl. Aff., ECF No. 13; Suppl. Reply, ECF No. 16.  This express non-waiver, therefore, qualifies the Alleged Debtor's consent to dismissal.

> ## 2. The Petitioning Creditors' ultimate acquiescence to dismissal does not constitute consent.

This Court recently held that "[a] petitioning creditor's nonopposition to dismissal **is not consent** under the statute where the debtor seeks **damages which are opposed by the creditor**." *In re Anmuth*, 600 B.R. at 186 (emphasis added) (quoting *In re Jett*, 206 B.R. 407, 409 (Bankr. E.D. Va. 1997)). Clearly, the Petitioning Creditors have actively opposed the Alleged Debtor's request for sanctions, indicating that dismissal was not on consent. *See* Feerst Opp., ECF No. 9; Resp. to Suppl. Decl., ECF No. 15; F's Second Opp., ECF No. 20.

The question of which party sought dismissal or whether dismissal was sought pursuant to section 303(j)(2) (i.e., on consent of all petitioners and the debtor) is also relevant.[20] In determining whether § 303(i) relief is available, courts have looked to whether dismissal was granted pursuant to § 303(j)(1) (i.e., on the motion of the petitioner) or § 303(j)(2). *In re Anmuth*, 600 B.R. at 186. For example, as stated in *Anmuth*, "[c]onsent under § 303(i) is not found where a petitioning creditor merely capitulates to a debtor's request for dismissal." *Id.*

In *Anmuth*, the petitioning creditors, relying on *In re Analytica Wire, Inc.*, 392 B.R. 618 (Bankr. D. Del. 2008) and *In re International Mobile Advertising Corp.*, 117 B.R. 154 (Bankr. E.D. Pa. 1990) *aff'd*, No. 90-11369S, 1991 WL 156588, at *1 (E.D. Pa. Aug. 13, 1991), argued that dismissal was "on consent" because they did not oppose the alleged debtors' motion to dismiss. *See id.* at 185. Chief Judge Craig disagreed, finding the cases relied on by the creditors to be clearly distinguishable: in each, the petitions were dismissed pursuant to § 303(j)(2), "on consent of all petitioners and the debtor." 11 U.S.C. § 303(j)(2); *see In re Anmuth*, 600 B.R. at 186. Specifically, in *Analytica Wire*, the petitioning creditors and the debtor *both* moved to dismiss and in *International Mobile Advertising* the parties filed a *joint motion* to dismiss. *See In re Anmuth*, 600 B.R. at 185. Such was not the case in *Anmuth*, where the petitioning creditors did not seek dismissal on their own or by joint motion, but rather the alleged debtors filed the motion to dismiss. *Id.* at 186. In further support of its finding of no consent, the *Anmuth* court looked to

---

[20] Section 303(j) of the Bankruptcy Code provides:

> Only after notice to all creditors and a hearing may the court dismiss a petition filed under this section—
>
> > (1) on the motion of a petitioner;
> > (2) **on consent of all petitioners and the debtor**; or
> > (3) for want of prosecution

11 U.S.C. § 303(j) (emphasis added).

*when* the petitioning creditors offered consent, noting that they did not do so until after the alleged debtors filed a motion to dismiss. *Id.*

Here, as in *Anmuth*, and unlike *Analytica Wire, Inc.* and *International Mobile Advertising*, the Alleged Debtor, and not the Petitioning Creditors, filed a motion to dismiss the involuntary case. Although Feerst, prior to the evidentiary proceedings, informed the Court that he attempted to resolve the case through a dismissal without prejudice, the parties were unable to reach an agreement. *See* OSC Hearing Tr. 4:3-7, 7:3-24. Nor did the Petitioning Creditors consent to dismissal even after the filing of the Motion, as reflected by their service of the initial stale summons. Aff. of Serv. Summ., ECF No. 8. In fact, Feerst filed a declaration opposing the Motion, asserting that service of the summons was proper. Feerst Opp., ECF No. 9. This conduct does not preclude an award under section 303(i). Lastly, the Petitioning Creditors sought and obtained a Supplemental Summons, further indicating their lack of consent to dismissal. *See* OSC Hearing Tr. 9:6-11. Even though the Petitioning Creditors ultimately announced that they were prepared to acquiesce to dismissal, that could not obliterate their previous conduct. "Indeed, to hold otherwise, all a petitioning creditor must do to defeat a claim under § 303(i) is to acquiesce to a debtor's motion to dismiss an involuntary petition." *In re Express Car*, 440 B.R. at 431.

Accordingly, the dismissal of the Petition was not "on consent" because (i) the Alleged Debtor reserved its rights to seek damages under section 303(i) and (ii) the Petitioning Creditors opposed dismissal and failed to offer consent to dismiss the case until after they were faced with sanctions.

### C.    Damages Under 11 U.S.C. § 303(i)(2)

Having determined that the elements delineated above have been satisfied, we now turn to whether sanctions are appropriate under the statute. Unlike an award under section 303(i)(1) for

attorneys' fees—where there is a presumption that costs and attorneys' fees will be awarded upon dismissal of an involuntary petition—an award under section 303(i)(2) "requires a finding of bad faith." *Lubow Mach. Co., Inc. v. Bayshore Wire Prod. Corp.* (*In re Bayshore Wire Prod. Corp.*), 209 F.3d 100, 105 (2d Cir. 2000) [hereinafter "*In re Bayshore*"]; *see Crest One Spa v. TPG Troy, LLC (In re TPG Troy, LLC)*, 793 F.3d 228, 235 (2d Cir. 2015); *In re Anmuth*, 600 B.R. at 191. The burden of proof on the issue of bad faith lies with the alleged debtor. *In re Bayshore*, 209 F.3d at 105 ("[T]here is a presumption of good faith in favor of the petitioning creditor, and thus the alleged debtor has the burden of proving bad faith." (internal quotations omitted)). Although the Second Circuit has not selected a particular test to determine the presence of bad faith, it has identified a variety of tests that have been utilized by the judiciary:

> Some courts have used an ***"improper use" test***, which "finds bad faith when a petitioning creditor uses involuntary bankruptcy procedures in an attempt to obtain a 'disproportionate advantage' for itself, rather than to protect against other creditors obtaining disproportionate advantages, particularly when the petitioner could have advanced its own interests in a different forum.". . . Other courts have applied an ***"improper purpose" test***, where bad faith exists if the filing of the petition was motivated by ill will, malice, or a desire to embarrass or harass the alleged debtor . . . . A third line of cases employs an ***objective test for bad faith*** based on "what a reasonable person would have believed." . . . Finally . . . a number of courts have sought to model the bad faith inquiry on the standards set forth in ***Bankruptcy Rule 9011***.

*In re Bayshore*, 209 F.3d at 105–06 (emphasis added) (citations omitted) (holding that there was no basis for a bad faith finding under any of the various tests in usage). Courts have noted that "findings of bad faith under the above referenced tests often overlap." *In re Landmark Distribs., Inc.*, 189 B.R. 290, 310 (Bankr. D.N.J. 1995); *see also In re Palmer*, No. 50 8-16-71186-reg, slip op. at 8 ("The Second Circuit has recognized that there are multiple tests employed by courts to determine whether a petition was filed in bad faith for the purposes of § 303(i)(2) . . . . The tests often overlap." (internal citations omitted)).

Case law reveals that the "totality of the circumstances" test is most frequently applied by the courts. *In re Anmuth*, 600 B.R. at 191 ("[M]ost courts 'determining whether to award damages under § 303(i)(2) . . . have adopted a 'totality of the circumstances test.'" (quoting *In re Taub*, 438 B.R. 761, 775 (Bankr. E.D.N.Y. 2010))); *In re Forever Green*, 804 F.3d at 336 (adopting the totality of the circumstances test as "suitable for evaluating the myriad ways in which creditors filing an involuntary petition could act in bad faith"). This Court, like the Second Circuit, need not determine which standard is correct because, under these facts, bad faith is met under any of these approaches.

**Totality of the Circumstances Test**

The totality of the circumstances test is a fact-intensive approach that considers various factors in determining whether an involuntary petition was filed in bad faith. *In re Forever Green,* 804 F.3d at 336. These factors include, but are not limited to, whether:

> the creditors satisfied the statutory criteria for filing the petition; the involuntary petition was meritorious; the creditors made a reasonable inquiry into the relevant facts and pertinent law before filing; there was evidence of preferential payments to certain creditors or of dissipation of the debtor's assets; the filing was motivated by ill will or a desire to harass; the petitioning creditors used the filing to obtain a disproportionate advantage for themselves rather than to protect against other creditors doing the same; the filing was used as a tactical advantage in pending actions; the filing was used as a substitute for customary debt-collection procedures; and the filing had suspicious timing.

*Id.* The circumstances surrounding this involuntary petition reflect the presence of nearly all of the factors, warranting a conclusion of bad faith based on the totality of the circumstances.

(I)  <u>The involuntary petition was filed to stall or halt the Contempt Hearing.</u>

In applying the "fact-intensive" review required by the "totality of the circumstances test," courts may consider whether "the filing was used as a tactical advantage in pending actions" and whether "petitioning creditors used the filing to obtain a disproportionate advantage for

themselves." *Id.* Another factor to consider in employing the totality of the circumstances test is whether the "filing had suspicious timing." *Id.*

This Court previously held that "[t]he filing of an involuntary petition to circumvent an adverse decision in the state court, ***or to preempt an impending state court decision***, or to stay a decision in the state court from taking effect, constitutes evidence of bad faith." *In re Anmuth*, 600 B.R. at 192 (emphasis added); *see In re Meltzer*, 516 B.R. 504, 515–16 (Bankr. N.D. Ill. 2014) ("A petitioner has no valid bankruptcy purpose—and acts in bad faith—when his goal is to stall or disrupt litigation in another court."); *see also In re Dami*, 172 B.R. 6, 10 (Bankr. E.D. Pa. 1994) ("Where the purpose of the bankruptcy filing is to defeat state court litigation without a reorganization purpose, bad faith exists."). Based on the testimony adduced at the Hearing, the documentary evidence, and the timing of events, there is no question that the Petitioning Creditors filed the Petition as a litigation tactic to halt or stall the Contempt Hearing.

Three of the four Petitioning Creditors were involved in the State Court Action and two of the four Petitioning Creditors, Stern and Shteierman, were explicitly subject to the state court's Contempt OSC, giving them a motive to halt or delay the Contempt Hearing.[21] A/D's Ex. 9; *see* Mot., ECF No. 4. The timing of the filing of the Petition—just one day prior to the scheduled Contempt Hearing—further supports the conclusion that the filing was a litigation tactic to prevent the Contempt Hearing from going forward.

In response to the Alleged Debtor's assertion that the Petitioning Creditors sought to avoid the Contempt Hearing, Feerst argued that the filing of the Petition did not in fact stay the State Court Action. At the Adjourned OSC Hearing, Kotkes, on behalf of Feerst & Associates stated:

"[I]n terms of the allegations that this was a bad faith filing in order to avoid the contempt hearing, that's without any legal merit as . . . debtor knows since the

---

[21] *See infra* note 35.

debtor is the plaintiff in the state court action . . . the filing of the petition does not state [sic] any of the proceedings . . . ."

Adjourned OSC Hearing Tr. 4:12-17 (emphasis added). Feerst also testified to the same effect under oath. Day 6 Tr. 58:6-7 ("There's no stay. CNG was the plaintiff. What stay are you talking about?"); Day 6 Tr. 91:3-5 ("[T]he state court action was not stayed automatically, while CNG was a plaintiff."). But Feerst adopted this contention only after the Court explained that there was no stay in effect. *See* OSC Hearing Tr. 10:10-13. In fact, prior to this explanation by the Court, Feerst requested "an order lifting the stay so [he could] go back to state court and deal with the contempt [motion]," indicating that he believed that the State Court Action *was stayed* by the filing of the Petition. *Id.* at 8:11-15.

Ultimately, Feerst reverted to his original position, undercutting any defense that he believed the Petition would not stay the Contempt Hearing. That testimony, while less than clear, demonstrates that Feerst did in fact believe that Fogel's individual contempt motion in the State Court Action, as opposed to the proceeding in general, *would be stayed* because CNG was the respondent:

> COURT: Wait—but I thought his—wait a minute, again. Let's be clear in the testimony. He's saying that he believed that the state court's view would be that . . . the action wouldn't be stayed because CNG was the plaintiff. But I think what he's saying within that . . . is that, [Fogel]'s individual motion against CNG would be stayed because . . . CNG was the respondent. Is that what you're trying to say?
> FEERST: Yes, Your Honor. Yes, Your Honor.
> COURT: So if you're trying to get [to]. . . whether he believed that the action, the involuntary would stay the contempt motion, I think the answer is yes, correct?
> FEERST: It would.
> COURT: Is that where you're going?
> […]
> GRAUBARD: Yeah . . . ***So it is your belief that the involuntary petition would stay the contempt motion because it was against CNG, is that correct***?
> FEERST: ***Yes***. It was in the nature—I'll use a better word that might—like a counter claim. It wasn't, but like a counter claim.

Day 6 Tr. 91:9-24, 92:4-9 (emphasis added). Feerst even testified that invoking the stay was a "good and single" reason to file the involuntary. *Id.* at 92:13-14.

After underscoring the Petitioning Creditors' argument that the Petition was "necessary in order to protect the creditors from [Fogel] seizing all of the assets of CNG, by way of her contempt motion," counsel to the Alleged Debtor asked Feerst:

> Q: Could you please explain how [Fogel] was going to seize all the assets to [sic] her contempt motion?
> FEERST: Well, you give me a million dollar judgment against a company like that, and I'll get the assets. I'll get a lawyer to find out how to seize them.
> [...]
> Q: And how would the filing of the involuntary petition protect against that?
> FEERST: *She stops. She can't do it*.
> Q: Why?
> FEERST: It would stop the case.
> Q: How would it stop the case?
> FEERST: *An involuntary against CNG stays [all] proceedings*, doesn't, if I understand things correctly.

*Id.* at 88:3-16 (emphasis added).

Irrespective of whether the filing of the Petition stayed the Contempt Hearing, it is clear from the testimony that Feerst *believed* that the filing of the Petition would stay the Contempt Hearing. This, combined with Feerst's testimony that the Petition would protect against Fogel seizing CNG's assets by obstructing her efforts to obtain a judgment, sufficiently evidences that the Petitioning Creditors filed the Petition to halt or stall the Contempt Hearing.

Moreover, even if Feerst had not expressly testified to his belief that the filing of the Petition would stay the Contempt Hearing, the *timing* of the filing alone indicates that the purpose was to stall the hearing. *In re Meltzer*, 516 B.R. at 516 ("The filing of an involuntary case shortly before a hearing in related litigation strongly suggests the case was filed only to stall the hearing.").

The combination of Feerst's belief that the Petition would halt the Contempt Hearing, and the timing of the filing clearly reveals that the Petitioning Creditors filed the Petition to gain a "disproportionate advantage" against CNG and preempt or stay the Contempt Hearing.

(II)      The Petitioning Creditors attempted to use the Petition to gain control of CNG.

As noted, courts analyzing bad faith under the totality of the circumstances test also consider whether the petitioning creditors "used the filing to obtain a disproportionate advantage for themselves." *In re Forever Green*, 804 F.3d at 336. Here, the actions taken in the State Court Action and testimony adduced at the Hearing suggest that Shteierman, and potentially others including Fogel's soon-to-be ex-husband, sought to use the filing of the Petition as a vehicle to wrest management control from Fogel and otherwise resolve issues with restaurant management to their benefit. Utilizing an involuntary petition as a means to resolve such issues is improper and suggests bad faith. *In re Grossinger*, 268 B.R. 386, 388 (Bankr. S.D.N.Y. 2001) ("To use an involuntary filing as a tactic to 'work it out' with one's alleged obligor is an abuse of the bankruptcy process and a violation of 11 U.S.C. § 303."); *see also In re Axl Indus., Inc.*, 127 B.R. 482, 484–85 (S.D. Fla. 1991), *aff'd in part, appeal dismissed in part sub nom. Remex Elecs. v. AXL Indus.*, 977 F.2d 598 (11th Cir. 1992) ("It is not appropriate to file an involuntary petition in an effort to gain control of the debtor's business."); *In re Better Care, Ltd.*, 97 B.R. 405, 412 (Bankr. N.D. Ill. 1989) (finding that one petitioning creditor's purpose to use the petition in an attempt to control the debtor corporation "to the extent legitimate, would have been more appropriately accomplished through a state court proceeding").

Fogel, in her capacity as principal of the Alleged Debtor, asserts that the Petition was "filed as part of a scheme to try to steal CNG," which is evidenced by the actions taken by some of the Petitioning Creditors in the State Court Action. Mot. ¶ 6, ECF No. 4. Moreover, Fogel and CNG

allege that David Zaitschek, Feerst, and Stern sought, among other things, to enjoin Fogel from entering the restaurant premises. *Id.* ¶ 7.

Shteierman appears to have directed those efforts, given Feerst's testimony that Shteierman was his client contact at CNG and the individual who hired him to represent CNG with respect to the State Court Action. Day 5 Tr. 93:5-13. Feerst also stated that when Fogel "regained control" of the company, he no longer had a supervisor to report to, further indicating that Shteierman was controlling the actions taken by Feerst in the State Court Action. Day 6 Tr. 103:9-10.

Stern's testimony further reinforces the conclusion that Shteierman was behind the plan to take control of CNG away from Fogel so it could be given to David Zaitschek:

> Q: I'm going to ask you to read Paragraph 3 [of the Stern Affidavit[22]], please. There were statements there that skimming money, failure to pay bills, failure to keep standard of care, failure to turn over tips for service, interference with performance of employees and their jobs . . . . How did you get that information to put in Paragraph 3?
> STERN: Some of the information was offered by me, but most of the information was offered by—I didn't write the document Isaac Shteierman wrote the document.
> Q: How do you know Isaac Shteierman wrote the document?
> STERN: Because he handed the document and asked me to sign it.
> […]
> Q: Did you read the affidavit before you signed it?
> STERN: Briefly. I was mostly guided through the affidavit.
> Q: By whom?
> STERN: Isaac—
> Q: Who guided you through the affidavit?
> STERN: Isaac Shteierman.
> […]
> Q: How did Mr. Shteierman guide you through the affidavit?

---

[22] Stern's affidavit submitted in the State Court Action states as follows:

> Since I was retained I found that one of the principals, Deena Zaitschek, . . . has been skimming money from the cash register (mostly over 500.00 in just one day); has ceased paying CNG bills; has refused to maintain the standard of care required of a Carlos & Gabby's location; does not turn over tips to the servers; interferes with the performance by the employees of their jobs; and simply just appears at work to see how much money she can purloin from the company checking account or cash register.

Stern Aff., A/D's Ex. 23-1.

> STERN: *By informing me that it was a way to get [Fogel] out of the business*.
> […]
> THE COURT: Do you know what he meant by that?
> STERN: *That he wanted to take away the ownership and responsibility of the restaurant from [Fogel] and pass it along to David*.

Day 5 Tr. 24:20-25, 25:1-5, 27:12-17, 28:2-4, 28:11-14 (emphasis added).

Moreover, Feerst testified that the impetus for the Petition was that Fogel had regained control of the company:

> Q: Do you know how *[Fogel] regained control of CNG?*
> FEERST: I think she walked in, opened the door, walked around. I wasn't there, but I believe that's how it occurred. You regain control by controlling.
> Q: I understand—and you said that was at the end of the—
> *that was the event that made the [filing] of the involuntary petition imperative, is that correct?*
> FEERST: *Absolutely*.

Day 6 Tr. 100:20-101:2 (emphasis added).  When asked how his signature was obtained for the Petition, Stern again exposed Shteierman's stated motivations.

> Q: How did you come to get a copy of that to sign?
> STERN: It was presented to me by Isaac Shteierman.
> […]
> Q: Do you know why Mr. Shteierman asked you to sign that document?
> STERN: *He said that it'd be a way to get back into the business*.
> […]
> Q: Do you know what the mechanism would be to get back into the business?
> STERN: He said something about pushing a bankruptcy or saying that there was money owed to him. He convinced me that there was money owed to him by [Fogel].
> THE COURT: He convinced you that there was money owed to him meaning Mr. Shteierman by—
> STERN: Yes.

Day 5 Tr. 28:24-25, 29:4-6, 29:10-11, 29:17-22 (emphasis added).

Even assuming, *arguendo*, the Petition was not filed for the purpose of gaining management control of the Alleged Debtor, the evidence shows that the Petitioning Creditors, at a minimum, filed the Petition to resolve issues regarding Fogel's management of the business.

Feerst asserted that the filing of the petition was the Petitioning Creditors' effort to cause Fogel to "straighten out the operation, especially to the satisfaction of Kay who was the key player in the whole deal."[23] Day 6 Tr. 63:4-9.

> Q: How did the failure to proceed with the involuntary protect the creditors?
> FEERST: How did the failure to proceed with the involuntary protect the creditors? Because we believed that [Fogel] would rehabilitate her business interest, her business conduct. We were all ready, including me, to support that effort.

*Id.* at 64:4-9.  Further, Feerst's testimony indicates that his efforts were, at least in part, directed at benefitting Kay, who is *not a creditor* of the Alleged Debtor.  In responding to the Court's inquiries regarding the Petitioning Creditors' decision not to serve the supplemental summons, Feerst indicated that he spoke to Shteierman and Prensky and decided that it made "no business sense" to continue with the bankruptcy case because "[w]e couldn't get anything more than we got, alerted [Fogel], alarmed her and let Adam Kay know." *Id.* at 66:14-15.  Feerst continued that while Kay "was not a creditor," he "was an active participant [and] . . . had a real interest in having the matter resolved in a way that preserved his company, preserved his name." *Id.* at 66:15-19.

Thus, based on the evidence presented at the Hearing, this Court finds that the Petitioning Creditors attempted to use the filing of the Petition for improper purposes aimed at gaining a disproportionate advantage for themselves and other non-creditors.

(III)    The Petitioning Creditors failed to properly serve the Summons and failed to serve the Supplemental Summons.

"An involuntary petition which is not duly served upon the alleged debtor raises twin specters of collusion and oppression." *In re Stern*, 268 B.R. 390, 391 (Bankr. S.D.N.Y. 2001).  The Petitioning Creditors failed to properly serve the Alleged Debtor on two separate occasions and

---

[23] Kay is not a creditor of the Alleged Debtor. According to Feerst, "[w]ithout Kay's active acquiescence and assistance, it's a nothing. He pulls the franchise, he pulls the sign, she's got an empty restaurant." Day 6 Tr. 63:7-9.

acquiesced to dismissal only after the Alleged Debtor filed a motion to dismiss and sought sanctions.  As such, the Court finds that, in considering the totality of the circumstances, this is further evidence of bad faith and that the Petitioning Creditors merely "used the filing to obtain a disproportionate advantage for themselves" and as a "tactical advantage" in the pending State Court Action.

(IV)    The Petitioning Creditors failed to conduct a reasonable inquiry before filing the Petition and their alleged claims are illegitimate or subject to a bona fide dispute.

Other factors to consider under the totality of the circumstances test include whether "the involuntary petition was meritorious" and whether "the creditors made a reasonable inquiry into the relevant facts and pertinent law before filing." *In re Forever Green*, 804 F.3d at 336.  The Court looks to "'what the petitioning creditor knew or should have known' with respect to the petition's merit, and whether the petitioning creditor 'knowingly alleg[ed] false information' or displayed a 'reckless disregard of the truth.'" *In re Anmuth*, 600 B.R. at 197 (quoting *In re Dino's, Inc.*, 183 B.R. 779, 783 (S.D. Ohio 1995)).

Bad faith also exists where creditors file an involuntary petition "knowing their claims are in bona fide dispute."[24] *Id.*; *see also In re Meltzer*, 516 B.R. at 517 (finding that the claims of all three petitioning creditors were subject to a bona fide dispute). While the Bankruptcy Code does not define the phrase "bona fide dispute," the Second Circuit has adopted an objective test which asks whether there "is an objective basis for either a factual or a legal dispute as to the validity of [the] debt." *In re BDC 56 LLC*, 330 F.3d 111, 117–18 (2d Cir. 2003), *abrogated on other grounds by In re Zarnel*, 619 F.3d 156 (2d Cir. 2010) (quoting *In re Busick,* 831 F.2d 745, 750 (7th Cir.

---

[24] Pursuant to section 303(b)(1), an involuntary case may be filed "by three or more entities, each of which is ... a holder of a claim against [the debtor] that is not contingent as to liability or the subject of a bona fide dispute as to liability or amount. . . ." *In re Meltzer*, 516 B.R. at 516 (citing 11 U.S.C. § 303(b)(1)).  A creditor does not qualify if its claim is in a bona fide dispute. *Id.* (citing *In re Busick*, 831 F.2d 745, 750 (7th Cir. 1987)).

1987)).  A bona fide dispute exists where "there is either a genuine issue of material fact that bears upon the debtor's liability or a meritorious contention as to the application of law to undisputed facts." *In re TPG Troy, LLC*, 793 F.3d at 234 (internal quotations omitted).  The Second Circuit has adopted a burden-shifting framework, which requires that the petitioning creditor first establish a prima facie case that no dispute exists, at which point the burden shifts to the debtor to demonstrate the existence of such bona fide dispute. *Id.*

In this case, the Petitioning Creditors did not undertake the "type of due diligence and sober decision-making process that should precede any involuntary filing." *In re Forever Green*, 804 F.3d at 337. The most striking example of this is the clear discrepancy between the information contained in the Petition and testimony adduced at the Hearing—particularly with respect to the Petitioning Creditors' alleged claims.  Further, all of their claims appear to be subject to a bona fide dispute, at best.[25]  By example, the Petition indicates that Stern has a claim in the amount of $6,879 for "wages." Pet., ECF No. 1. However, Stern testified this is untrue:

> Q: Was that a valid claim?
> STERN: No.

Day 5 Tr. 30:15-16.

Feerst & Associates' alleged $10,745 claim is also clearly subject to a bona fide dispute. Feerst testified that Shteierman hired him to represent CNG in the State Court Action and agreed to pay him a $15,000 flat fee—$10,745, representing the unpaid balance. *See* Day 5 Tr. 93:5-13. But the Alleged Debtor established that this amount may in fact represent a claim for work done by Feerst for Kay's company, Jumex—not CNG.  Specifically, the Alleged Debtor introduced a document that Feerst sent to CNG, containing time records for work done by Feerst & Associates

---

[25] While the burden is on the Alleged Debtor to show bad faith by a preponderance of evidence, with respect to the merits of the Petition, the Petitioning Creditors, and not the Alleged Debtor, have the burden of demonstrating a prima facie case that their claims are not subject to a bona fide dispute.

and a balance of $10,745.  A/D's Ex. 25; *see* Day 5 Tr. 93:25-94:2.  However, Feerst conceded that certain time entries on the bill sent to CNG belonged to a different client matter.  Day 6 Tr. 19:5-6 ("Yeah. They apply to the case commenced by Jewmex against [Fogel] in Nassau County.").  In particular, the invoice included work done in "a Nassau County action that was commenced at the instruction of Adam Kay against CNG." A/D's Ex. 25.  Feerst admitted that his client in that matter was Jumex,[26] and that the bill should not have been sent to CNG:

> Q: So why was the bill going to CNG Foods, LLC if your client was Jumex?
> FEERST: It shouldn't have gone there. It should have went to Adam's address. Of course obviously it was not properly addressed.

Day 5 Tr. 98:15-19; *see id*. at 94:3-8, 97:22-25.  Feerst continued:

> COURT: Okay. So would this be a time where you might want to, I don't know, do you want to look at that 10,745 balance and restate . . . the amount?
> FEERST: It would be . . . *it's certainly not correct*, because the balance would not be due CNG. The balance part of it, one dollar of it, a good sum of it will be due from Jumex for whom I brought the case in Nassau County.

*Id.* at 104: 6-12 (emphasis added).  While it is not clear to the Court whether Feerst's claim as listed in the Petition in fact represents a claim against Jumex, the Court finds it telling that the invoice erroneously sent to CNG indicated a balance of $10,745—the exact amount of Feerst's alleged claim against the Alleged Debtor. In any case, Feerst testified that he had no written agreement evidencing such claim against CNG, and no physical evidence to support it. *Id.* at 91:21-22.  Based on this, not only did Feerst & Associates fail to make a prima facie case that its claim is not subject to a bona fide dispute, but the Court also finds that the disputed nature of this claim further evidences bad faith.

---

[26] Despite admitting that he represented Jumex with respect to the Nassau County Litigation, Feerst later testified that he was not its "attorney of record" and that he merely "prepared the papers." *See* Day 5 Tr. 94: 7-8 (Q: You represented Jumex. A: Right.); Day 6 Tr. 19:7-10 (Q: And you were the attorney for Jewmex in that case? A: I prepared the papers. That was what I did, not more. Q: You prepared the papers. Were you attorney of record. A: No).

A bona fide dispute also exists with respect to Prensky's claim.  Notably, Prensky did not provide any testimony in support of her alleged $100,000 claim.  Fogel and the Alleged Debtor contend that Prensky holds no claim against the Alleged Debtor.[27]  *See* A/D's Closing ¶ 3, ECF No. 65; *see also* Day 1 Tr. 67:3-9, 67:25; Day 3 Tr. 45:2-16.  The only support for Prensky's claim is a check in the amount of $95,930 endorsed by Prensky and deposited into a checking account Fogel used for a Carlos and Gabby's franchise restaurant Fogel planned on opening in Teaneck, New Jersey.[28]  Day 5 Tr. 89:19-25, 90:4-9; *see* Day 2 Tr. 46:10-25.  Fogel credibly testified that she had no written agreement with Prensky, but that the check in the amount of $95,930 presented at trial was given to Fogel by Prensky as an investment in the Teaneck location. Day 1 Tr. 67:3-9, 67:25; Day 3 Tr. 45:2-16.  The Alleged Debtor provided evidence that this check was deposited into a checking account that Fogel used specifically for the Teaneck location. A/D's Ex. 15; Day 2 Tr. 46:10-22, 90-92.  Prensky, therefore, failed to make a prima facie case that her $100,000 claim is not subject to a bona fide dispute.

Shteierman's $11,000 asserted claim is also subject to a bona fide dispute.  The Petitioning Creditors failed to provide any evidentiary support for this claim and therefore failed to meet their burden to establish that such claim was not subject to a bona fide dispute.  Nor did Shteierman appear at the hearing to provide testimony in support of a claim.  Notably, Fogel provided specific testimony that Shteierman was a "volunteer consultant," rendered services to the Alleged Debtor as a volunteer, never loaned money to the Alleged Debtor, and does not have a valid claim for a loan. Day 3 Tr. 72:20-73:25; Day 1 Tr. 47:11-19.

---

[27] The Alleged Debtor asserts that, in fact, it is CNG that has a claim against Prensky in the amount of $45,000 for unpaid catering charges. *See* Day 3 Tr. 56-58.

[28] The check is made out by Jay Anderson, who is believed to be Prensky's cousin. Day 1 Tr. 68:1-7; A/D's Ex. 15.

In addition to their failure to establish a prima facie case that their claims were not subject to a bona fide dispute, Feerst and the other Petitioning Creditors clearly knew or should have known the claims were subject to a bona fide dispute and that the Petition, therefore, lacked merit. Feerst testified that the check used to support Prensky's alleged claim was the *only* documentation he had with respect to the claims of the four Petitioning Creditors, Day 5 Tr. 89:19-25; 90:13, 90:22-24, and that it was in fact provided to him by the Alleged Debtor in court, thereby indicating that even this singular document was not in his possession at the time he prepared the Petition:

> Q: Do you have written documents in your file regarding the claims of the four people who are petitioning creditors?
> FEERST: Yes.
> Q: What kind of documents do you have?
> FEERST: I have a . . . check . . . that your client [Fogel] cashed and that she never reimbursed Eileen Prensky for. I think it's about $95,000 . . . You gave [the check] to me in court. We never had it. . . that's the only document I have.

*Id.* at 89:19-25, 90:6-24.

The Petitioning Creditors also failed to submit any evidence regarding due diligence undertaken in the preparation of the Petition. Stern testified that he spoke to no one regarding his claim.

> Q: Did you speak with anyone about the information that was being put into this involuntary petition?
> STERN: No.
> Q: Did anyone ask you anything about information . . . which should be put into the involuntary petition?
> STERN: No
> […]
> Q: Did you discuss a wage claim with Mr. Feerst?
> STERN: No.

*Id.* at 30:17-22, 31:6-7.

The circumstances surrounding the preparation and filing of the Petition are highly questionable at best.  Feerst himself all but admitted a complete failure to investigate the claims

asserted on the Petition. How Feerst received the information contained on page three of the Petition (i.e., the claim amounts of the Petitioning Creditors) remains an unknown. When asked whether he spoke to the Petitioning Creditors, Feerst responded "I don't remember." Day 5 Tr. 87:8-15. Feerst's testimony on this topic was murky and hypothetical:

> "I think [my employee who prepared page three] would have asked me where would he get the information. I would have said one of several things, speak to one of the other lawyers in the office who's familiar with the situation, find Shteierman, get it from him, meet with any or all of these people who you believe are going to sign, who I believe are going to sign. That is the panorama of possibilities. And I can't answer more than that."

*Id.* at 88:14-21.

Feerst also represented to the Court that he had "no documents being held by [him], examined by [him], reviewed by [him], [or] ever given to [him] on behalf of these petitioning creditors." Day 2 Tr. 10:4-7. The Court asked Feerst, "[s]o when you met with [the Petitioning Creditors], you didn't ask them for paper backup about what they were telling you should put down in the petition?" *Id.* at 13:8-10. Conveniently evading the question of whether Feerst ever met with the Petitioning Creditors with respect to their claims, Feerst responded "I did not ask for paper backup. That is correct." *Id.* at 13:11-12.

Further, when the Court inquired of Feerst whether he asked Prensky if there was a note supporting her $100,000 claim, Feerst responded, "I didn't ask her if it was a note. The only document that exists . . . is the cancelled check . . . . That's it. There's nothing else." *Id.* at 12:25-13: 7. As noted above, the cancelled check document to which Feerst was referring was not possessed by him prior to the Petition, but supplied to him by the Alleged Debtor during this litigation. *See* Day 5 Tr. 89:19-25, 90:6-24.

The testimony also shows a lack of diligence on the part of Stern, who signed the Petition.

Stern testified that he "didn't read the document" and that he "saw a signature line and was asked to sign it." Day 5 Tr. 32:25, 33:2.  He also testified that "I signed [the Petition] because Isaac asked me to sign it" and that Shteierman "rushed" him into signing it. *Id.* at 33:22, 34:2.

The Petitioning Creditors' failure to provide evidentiary support for the alleged claims asserted as the statutory basis for the Petition, as well as the Hearing testimony, supports a finding by the Court that they failed to conduct any inquiry, let alone a reasonable inquiry, into the claims and pertinent law.  The lack of due diligence, together with their inability to establish a prima facie case that they hold claims not subject to a bona fide dispute, evidences that the Petitioning Creditors knew or should have known that the Petition lacked merit.  Consequently, the Court finds bad faith under this analysis as well.

### *The Improper Use Test*

According to the Second Circuit, the "improper use" test is met "when a petitioning creditor uses involuntary bankruptcy procedures in an attempt to obtain a 'disproportionate advantage' for itself, rather than to protect against other creditors obtaining disproportionate advantages, particularly when the petitioner could have advanced its own interests in a different forum." *In re Bayshore*, 209 F.3d at 105 (citing *In re K.P. Enter.*, 135 B.R. 174, 179 n. 14 (Bankr. D. Me. 1992)). As outlined *supra*, this factor is also embodied in the totality of the circumstances test. *In re Forever Green*, 804 F.3d at 336 (noting that consideration should be given to whether "petitioning creditors used the filing to obtain a disproportionate advantage for themselves rather than to protect against other creditors doing the same" and whether "the filing was used as a tactical advantage in pending actions").

Under the "improper use" test, a petitioning creditor has acted in bad faith where, like here, that creditor attempts to use an involuntary bankruptcy case to gain control of a corporation. *In re Landmark*, 189 B.R. at 309, n.20.

As previously delineated, the testimony elicited at the Hearing clearly evidences that the Petitioning Creditors used the filing for self-motivated purposes to stall or halt the Contempt Hearing and to gain management control of CNG (i.e., to obtain a disproportionate advantage, particularly where they could have advanced their interests in state court). As such, the bad faith standard is satisfied with respect to this test.

### The Improper Purpose Test

Courts also employ the "improper purpose" test as an indicator of bad faith. That test focuses on whether the "filing of the petition was motivated by ill will, malice, or a desire to embarrass or harass the alleged debtor." *In re Bayshore*, 209 F.3d at 105; *see In re Camelot, Inc.*, 25 B.R. 861, 868–869 (Bankr. E.D. Tenn. 1982) (finding bad faith where "[d]issatisfied with the outcome of the legal proceedings which they had commenced in [state court, the petitioning creditors] vindictively filed an involuntary petition which . . . caused a substantial amount of time, expense and inconvenience for the debtor"). Courts have also "employed a more expansive definition of bad faith to include ill will or malice toward the debtor or its owners." *In re Anmuth*, 600 B.R at 194 (quoting *Jaffe v. Wavelength Inc. (In re Wavelength, Inc.)*, 61 B.R. 614, 620 (9th Cir. BAP 1986)). "[C]ourts should be wary of creditors who may find alluring the 'retributive quality' of thrusting a debtor into bankruptcy." *Id.* (quoting *In re Forever Green*, 804 F.3d at 335). In assessing whether the filing of a petition is done with ill will or malice, petitioning creditors' actions before and after filing must be examined. *Id.* at 195.

This test is clearly satisfied here, where the pre-petition relationship between the relevant parties and the pre-petition state court litigation demonstrates that the Petition was filed for an improper purpose with ill will and malice.  Fogel's unrebutted testimony[29] disclosed that, pre-petition, Fogel and Shteierman had an acrimonious relationship. Fogel testified that Shteierman yelled and cursed at her, compared her to his mother who had a Ponzi scheme and went to jail, called her a horrible person, and "put [her] down." Day 1 Tr. 44:1-8; *see* Day 3 Tr. 72:20-73:9 ("[H]e would come in and yell and throw things at me. He would scream and curse at me. . . He would demand things of me, and he hurt my marriage further."). When asked if she ever had problems that caused her to call the police, Fogel testified that she did so three times.  Day 1 Tr. at 44:20-25.

The Petitioning Creditors were also likely dissatisfied with the developments in the State Court Action.  It was commenced by Feerst and Shteierman in an attempt to preliminarily enjoin Fogel from entering CNG's business premises. *See* Mot. ¶ 7, Ex. C, ECF No. 4.  Not only did this attempt fail but, just prior to the Petition Date, Justice Ash had restored Fogel's right to access the premises and had scheduled the Contempt Hearing to assess whether the CNG Representatives should be sanctioned for their actions taken against Fogel. *See* A/D's Ex. 9; Mot. ¶ 14-15, Ex. A, Ex. G, ECF No. 4.

The toxic relationship between the parties, combined with the following established findings of fact: (i) Shteierman and others were attempting, and failing, to obtain control of CNG through the State Court Action, (ii) the Petition was not meritorious, and the asserted claims are invalid or subject to a bona fide dispute, and (iii) the Petitioning Creditors were dissatisfied with

---

[29] Shteierman did not testify at the Hearing.

the developments in the State Court Action, lead to the obvious conclusion that the filing of the Petition was done with ill will.[30]

### The Objective Test and Rule 9011 Test

Courts also employ an "objective test" and a Rule 9011 analysis when determining whether there is bad faith. *In re Bayshore*, 209 F.3d at 106. The objective test asks whether or not a "reasonable person would have filed the involuntary petition under the same circumstances." *In re Landmark*, 189 B.R. at 310 (internal quotations omitted); *see also In re Bayshore*, 209 F.3d at 100, 105–06 (noting that a line of cases "employs an objective test for bad faith based on what a reasonable person would have believed") (internal quotations omitted); *see also In re Walsh*, 306 B.R. 738, 742 (Bankr. W.D.N.Y. 2004) (the objective test "inquires into what a reasonable person would have believed in connection with the purpose of Section 303 and the allegations required to be made").

---

[30] In determining whether bad faith exists under this test, courts also consider whether there is "personal antipathy" against the alleged debtor. *See In re Anmuth*, 600 B.R. at 195 n.22 (quoting *In re Better Care*, 97 B.R. at 412) (finding testimony from petitioning creditor calling the principle of the alleged debtor a "ganef," or a thief evidenced personal antipathy); *see also In re Better Care*, 97 B.R. at 412 (finding that the improper purpose test was met where testimony indicated that the petitioning creditors "maliciously intended to shut down" the alleged debtor's business "because of personal antipathy"). Feerst's testimony does suggest personal antipathy against Fogel:

> Q: As a petitioning creditor, what was your purpose of signing the involuntary petition?
> FEERST: To stop your client from stealing the company and stripping it of its assets and preventing her from being awarded the million bucks she was seeking in contempt fines. That was my purpose.
> […]
> Q: As an attorney what was your purpose of filing the involuntary petition?
> FEERST: To preserve the assets from being stolen by your client.

Day 6 Tr. 57: 14-19, 62:4-6. Feerst also testified:

> Q: How do you know that—I want to know how [Fogel] was systematically [looting] CNG as you allege […]
> FEERST: By taking money and putting it in her pocketbook is the way I understood it was working.
> Q: And where did you get that information from?
> FEERST: Isaac Shteierman.

Day 6 Tr. 42:17-22.

The test, based on the standards set forth in Bankruptcy Rule 9011, considers and examines both the "subjective motivation" and the "objective reasonableness" of the petitioning creditors. *See In re Landmark*, 189 B.R. at 310, n.24.  As set forth by the Eleventh Circuit:

> An analysis under Rule 9011 inquires into "a significant objective requirement bearing on the legal justification of a claim or defense: a reasonable inquiry into the facts and the law." In addition to requiring an objective inquiry, Rule 9011 requires a subjective inquiry as well: the bankruptcy proceeding cannot have been interposed for an improper purpose, "such as to harass, to cause delay, or to increase the cost of litigation."

*In re Bayshore*, 209 F.3d at 106 (quoting *Gen. Trading Inc. v. Yale Materials Handling Corp.*, 119 F.3d 1485, 1502 (11th Cir. 1997) *cert. denied*, 523 U.S. 1055 (1998)).

This Court finds that both tests are met here. The actions taken by the Petitioning Creditors in filing the Petition were not those of a reasonable person and their subjective motivation—at the very least, to stall or halt the Contempt Hearing—was clearly improper. *See e.g., In re Palmer*, No. 50 8-16-71186-reg, slip op. at 9 ("The Petitioners' conduct leads the Court to conclude that the Petitioners were concerned with obtaining an advantage in the state court litigation, which finding satisfies the objective test, as well as the subjective/objective test."). Further, as described in detail above, the Petitioning Creditors failed to conduct a reasonable inquiry into the claims and pertinent law. *In re Reveley*, 148 B.R. 398, 408 (Bankr. S.D.N.Y. 1992) ("[W]here the petition is defective and the evidence shows that the petitioners conducted only a perfunctory investigation before filing, the court may find bad faith under the Rule 9011 standard.").

Consequently, under each of the outlined approaches, the Court concludes that the Petition was filed in bad faith under section 303(i)(2).

### D.    Attorneys' Fees Under 11 U.S.C. § 303(i)(1)

In this Circuit, "there is a presumption that costs and attorney's fees will be awarded to the alleged debtor" when an involuntary petition is dismissed. *In re TPG Troy, LLC*, 793 F.3d at 235

(quoting *In re Mountain Dairies*, 372 B.R. 623, 637 (Bankr. S.D.N.Y. 2007)); *see also In re Skyworks Ventures, Inc*., 431 B.R. 573, 576 (Bankr. D.N.J. 2010) ("The imposition of costs and fees is discretionary, but the majority rule typically awards fees and costs to the debtor upon dismissal."). While the presence of bad faith is germane to the analysis, "[u]nlike an award under § 303(i)(2), 'bad faith is not a prerequisite to an award of costs and attorney's fees under § 303(i)(1).'" *In re Anmuth*, 600 B.R. at 186 (quoting *In re Bayshore*, 209 F.3d at 105); *see In re TPG Troy, LLC*, 793 F.3d at 235; *In re Diloreto*, 388 B.R. 637, 648 (Bankr. E.D. Pa. 2008), *aff'd*, 442 B.R. 373 (E.D. Pa. 2010).

"[T]he burden of proof is on the [petitioning creditors] to justify a denial of costs and fees." *In re Anmuth*, 600 B.R. at 186 (quoting *In re Mountain Dairies*, 372 B.R. at 637). If the court determines that an award of attorneys' fees is appropriate under section 303(i)(1), such award may include fees incurred in seeking attorneys' fees and damages pursuant to section 303(i). *See In re TPG Troy, LLC*, 793 F.3d at 235; *see also In re Anmuth*, 600 B.R. at 186–88 (finding that limiting the fees to those incurred in prosecuting the dismissal motion, but not the sanctions motion, "would undermine the purpose and intent [of] § 303(i)(1)").

In awarding fees pursuant to section 303(i), most courts "have adopted a totality of the circumstances test," considering various factors, including "(1) the merits of the involuntary petition; (2) the role of any improper conduct on the part of the alleged debtor; (3) the reasonableness of the actions taken by the petitioning creditors; and (4) the motivation and objectives behind the filing of the petition." *In re TPG Troy, LLC*, 793 F.3d at 235 (quoting *In re Taub*, 438 B.R. 761, 775 (Bankr. E.D.N.Y. 2010)).

Here, the Petitioning Creditors have failed to offer any evidence to justify a denial of fees or to rebut the presumption in favor of an award of fees and costs.  There is no evidence to suggest

that the Alleged Debtor did not "act with 'appropriate discretion'" or "unreasonably delayed these proceedings," and the actions taken by the Alleged Debtor in preparing for trial were reasonable. *In re Anmuth*, 600 B.R. at 189 (quoting *In re Forever Green Athletic Fields*, Inc., No. BR 12-13888-MDC, 2017 WL 1753104, at *11 (Bankr. E.D. Pa. May 3, 2017)). Further, the Alleged Debtor has established that an award of attorneys' fees and costs is appropriate under the totality of circumstances.

Counsel to the Alleged Debtor, M. David Graubard, seeks attorneys' fees in the amount of $81,280 and disbursements in the amount of $1,368.05. Graubard submitted an Affirmation of Legal Services and Expenses, ECF No. 18 (the "Initial Affirmation"), and a Second Affirmation of Legal Services and Expenses, ECF No. 66 (the "Second Affirmation," together with the Initial Affirmation, the "Affirmations"), in support of this request.

In addition to Graubard's own attorneys' fees and costs in this matter, Graubard also seeks $8,587.50 for attorneys' fees incurred by the Law Office of Jason B. Shannaum, PLLC, the firm that represented Fogel in the State Court Action, for a total award of fees in the amount of $89,867.50 and disbursements in the amount of $1,368.05. [31]

***Graubard's Fees***

While an award of attorneys' fees and costs is clearly justified, the Court finds that a 15% reduction of Graubard's fees is appropriate here. *See In re Advance Press & Litho, Inc.*, 46 B.R. 700 (Bankr. D. Co. 1984) (reducing attorneys' fees from $16,400 to $10,000 where the Court assessed the fees incurred by the debtor and made certain reductions thereto based on, *inter alia*, its finding that counsel's hourly rate for court appearances was not warranted and some preparation

---

[31] In his Second Affirmation of Legal Services and Expenses, Graubard incorrectly indicates that the total fees and disbursements incurred in this matter total $87,227.50, but the fees and disbursements he seeks, including Shannaum's fees, total $91,235.55—which includes, as noted above, $89,867.50 for all legal fees and disbursements in the amount of $1,368.05. *See* Second Aff., ECF No. 66.

was excessive); *see also In re Express Car*, 440 B.R. 431 (finding that a portion of the former debtors' pretrial work was not reasonable where certain "personality conflicts . . . contributed to some needless pretrial litigation between the parties" and therefore reducing award of attorneys' fees from $34,524 to $26,495).

Graubard's Initial Affirmation, covering the first six months of his representation, reflects that he spent approximately 35.3 hours (i) researching issues with respect to the non-validity of the Petition; (ii) learning the history of the State Court Action; (iii) preparing the motion to dismiss and for sanctions; (iv) filing various responses with respect thereto; and (v) attending two court hearings. Initial Aff., ECF No. 18.  The Second Affirmation, covering the following thirteen-month period, indicates that Graubard spent 167.9 hours on tasks such as (i) preparing for a hearing on the Motion; (ii) serving Kay with a subpoena and other discovery requests; (iii) preparing for and attending the Hearing, held over six non-consecutive days, which included time spent preparing extensive questions for Fogel's testimony and organizing trial exhibits and researching legal issues related thereto; (iv) attending a hearing on the Motion; (v) drafting a motion for discovery sanctions; (vi) participating in numerous phone calls with Jason Shannaum, Esq., counsel to Fogel in the State Court Action, and Nussin Fogel, Esq., Fogel's uncle; (vii) preparing filings to determine whether Feerst was attorney of record for the Petitioning Creditors and conducting legal research related thereto; (viii) drafting and filing a motion to compel compliance with discovery; and (ix) preparing and filing a closing memorandum. Graubard's rate for the entire period was $400 per hour.[32] Second Aff., ECF No. 66.

---

[32] Graubard's fees (not including disbursements), therefore, total $14,120 for the time period between July 28, 2016 through February 15, 2017 and $67,160 for the time period between February 16, 2017 and March 20, 2018, totaling $81,280.

The Court finds that some of Graubard's time—particularly his communications with Nussin Fogel and time spent on certain pleadings and motions—appears somewhat excessive and duplicative, warranting a 15% reduction of the entire award sought.

### Shannaum Fees

Graubard also seeks attorneys' fees incurred by the Law Office of Jason B. Shannaum, PLLC, Fogel's state court counsel.  According to Graubard, Shannaum's time in state court was attributable to informing the state court regarding the filing of the Petition and the effect thereof. Graubard asserts that these fees are "additional damages to the Debtor" and alleges that the Petitioning Creditors were the de facto plaintiffs in the State Court Action, and that the interests of the Alleged Debtor are aligned with Fogel's interests in the State Court Action. Initial Aff., ECF No. 18.

Based on the plain language of the statute, the Alleged Debtor's request with respect to fees incurred by Law Office of Jason B. Shannaum, PLLC is denied. Section 303(i) provides that "[i]f the court dismisses a petition under this section […], the court may grant judgment—(1) against the petitioners *and in favor of the debtor* for—(A) costs; or (B) a reasonable attorney's fee." 11 U.S.C. § 303(i) (emphasis added).  While case law on this issue is sparse, at least one court has found that only a debtor is entitled to attorneys' fees and costs pursuant to section 303(i)(1). *In re VII Holdings Co.*, 362 B.R. 663, 667 (Bankr. D. Del. 2007) ("The plain language of section 303(i)(1) is clear—only a debtor may recover attorneys' fees and costs under subsection (1)."). This Court agrees that section 303(i)(1), by its plain language, only permits recovery of attorneys' fees by a debtor, and here Shannaum was acting as counsel to Fogel.

Accordingly, taking into account the 15% reduction and the denial of Shannaum's fees, the Court hereby approves attorneys' fees and costs to Graubard in the amount of $69,088,[33] and $1,368.05, respectively.

### E.    Punitive Damages

The filing of an involuntary petition is considered an "extreme remedy" with serious consequences to alleged debtors and creditors. *In re Meltzer*, 516 B.R. at 515 ("An involuntary case is serious business."); *see In re Grossinger*, 268 B.R. at 387 ("In the case of a non-collusive filing, aside from the fact that other creditors will be subject to the automatic stay, a sham involuntary filing may be highly prejudicial to the debtor (e.g., in damaging debtor's reputation) and may be used by creditors as an improper bargaining tactic."); *see also In re Reveley*, 148 B.R. at 406 ("Petitioning creditors assume certain risks when filing involuntary bankruptcy petitions.").

An award of punitive damages pursuant to section 303(i)(2)—where the involuntary petition has been filed in bad faith—is within the Court's discretion. *In re Anmuth*, 600 B.R. at 202.  Unlike compensatory damages, punitive damages under section 303(i)(2) are intended to "punish a wrongdoer and deter similar conduct in the future" and may be awarded even where there is no proof of actual damages.  *Id. See also In re Palmer*, No. 50 8-16-71186-reg, slip op. at 9 ("The purpose of punitive damages is to punish a wrongdoer and deter similar conduct rather than compensate for actual loss").

This Court has previously utilized a totality of circumstances analysis in determining an appropriate award of punitive damages. *Id.* at 202–03. "The totality of the circumstances approach considers factors such as the petitioning creditors' net worth and the gravity of the consequences

---

[33] This number is reached by subtracting the fees sought by the Law Office of Jason B. Shannaum, PLLC (i.e., $8,587.50), and then reducing by 15% the fees sought by Graubard alone.

caused by the involuntary filing." *Id.* at 203. It is also appropriate to consider "the degree and nature of the wrong to the debtor, the intent of the creditors, and any surrounding aggravating or mitigating circumstances." *Id.* at 202–03 (citing *In re Meltzer*, 535 B.R 803, 815 (Bankr. N.D. Ill. 2015)).

In determining the amount of punitive damages, courts also must consider the Due Process Clause of the Fourteenth Amendment. U.S. CONST. amend. XIV, § 1; *In re Anmuth*, 600 B.R. at 203 ("Punitive damages offend due process if an award is grossly excessive in relation to the legitimate interests of punishment and deterrence."). In *Anmuth*, Chief Judge Craig considered the following three factors in assessing whether a punitive damage award would be grossly excessive under section 303(i)(2): (i) "the degree of reprehensibility of the defendant's conduct," (ii) "the ratio between actual damages and punitive damages," and (iii) "the civil and criminal penalties that could be imposed for similar conduct." 600 B.R. at 203–04 (quoting *In re John Richards Homes Bldg. Co.*, 291 B.R. 727, 738 (Bankr. E.D. Mich. 2003)) (finding that an award of $600,000 in punitive damages was warranted).

### 1. An award of punitive damages is appropriate.

The Alleged Debtor seeks punitive damages in the sum of at least $100,000. The Court, in its discretion, finds that a punitive award for the bad faith filing of the Petition is warranted here where, as in *Anmuth*, the Petitioning Creditors acted in a "blatant attempt to circumvent the pending state court litigation between the parties . . . and without regard to the requirements of the Bankruptcy Code." *Id.* at 203. The Petitioning Creditors also failed to conduct a reasonable inquiry

into the relevant facts and pertinent law prior to filing.  Accordingly, the Court finds that a punitive damage award in the amount of $75,000 is appropriate here.[34]

An award of $75,000 is not "grossly excessive." First, as noted above, the Petitioning Creditors were motivated by and acted in bad faith.  Second, a punitive award of $75,000 is permissible where the actual fees here, which consist of attorneys' fees and costs, total approximately $80,000. *Id.* at 204 (finding that a punitive award of $600,000 "is well within the ratio that the Supreme Court has found permissible" where the attorneys' fees incurred by the alleged debtors would substantially exceed $150,000).  Lastly, in *Anmuth*, this Court compared the punitive damages it awarded with that of the criminal penalties that would have been applied based on the fact the involuntary petitions contained knowingly false statements. The latter carried the potential for millions of dollars in collective fines and a substantial prison sentence based on "Official Form 205 Against a Non-Individual" which provides:

> WARNING – Bankruptcy fraud is a serious crime. Making a false statement in connection with a bankruptcy case can result in fines up to $500,000 or imprisonment for up to 20 years, or both.

*Id.* at 204-05; Pet., ECF No. 1; *see* 18 U.S.C. §§ 152, 1341, 1519, and 3571.

Similarly, the Petitioning Creditors here made false statements with respect to, at best, Stern's purported claim and, at worst, each of the Petitioning Creditors' claims.  Stern's misrepresentation alone could amount to a potential criminal fine of $500,000.  Thus, considering the totality of circumstances, the Court finds that a punitive damages award of $75,000 is appropriate.

---

[34] "The imposition of [punitive] damages must be considered in connection with the award of other damages and fees if the purpose of punitive damages is to be effective and not unduly harsh." *In re Advance Press*, 46 B.R. at 706.

      *2.      The punitive damages award shall be allocated amongst the Petitioning Creditors.*

In its exercise of discretion, courts may determine how an award of punitive damages should be allocated amongst petitioning creditors. *See In re Anmuth*, 600 B.R. at 205 ("[T]he bankruptcy court also retains the discretion to allocate liability for such an award among the Petitioning Creditors."); *see also In re Forever Green Athletic Fields, Inc.*, 2017 WL 1753104, at *9 ("While a bankruptcy court may hold petitioning creditors jointly and severally liable, there is no requirement that a § 303(i) award be assessed equally among the petitioning creditors. It is within a bankruptcy court's discretion to assess one creditor with the entirety of the § 303(i) award and hold the others harmless.").

This Court finds that, to a certain degree, the actions taken by the Petitioning Creditors were "undertaken as an intertwined group." *See In re Anmuth*, 600 B.R. at 205 (finding that "damages should be assessed against [the petitioning creditors] as a group").  However, certain of the Petitioning Creditors were motivated by bad faith to a greater degree than others.

Therefore, the $75,000 award in punitive damages shall be allocated, for the reasons stated below, as follows: against Prensky in the amount of $7,500, Stern in the in the amount of $15,000, Shteierman in the amount of $26,250, and Feerst & Associates in the amount of $26,250.

### *Prensky*

Prensky did not testify at the Hearing, and therefore the Court lacks certain information with respect to Prensky's motivation for becoming a Petitioning Creditor.  Prensky did sign the Petition asserting that she was the holder of a $100,000 claim against the Alleged Debtor.  She— and Feerst & Associates—also failed to present to the Court any credible support for a claim against the Alleged Debtor. There is no evidence that Prensky conducted any due diligence prior to signing the Petition.  On the other hand, Prensky was not involved in the State Court Action,

and the Court has no other evidence of a strained relationship with the Alleged Debtor indicating that she signed the Petition based on ill will.  Moreover, the Court has no reason to believe that Prensky had an interest in halting the Contempt Hearing or had an interest in the management of CNG. Thus, the Court finds that Prensky should be responsible for 10% of the punitive damage award—$7,500.

### Stern

It appears that Stern signed the Petition as a result of Shteierman instructing him to do so. Unlike Prensky, Stern was involved in the State Court Action and was a party subject to the state court's Contempt OSC.  He was therefore motivated to file for the improper purpose of stalling the Contempt Hearing.  Stern also asserted a claim against CNG in the Petition, so that he could be a petitioning creditor, while later testifying that no such debt existed.  While Stern's conduct was extremely improper and grossly negligent, the Court finds that he is less culpable than Shteierman and Feerst & Associates. Stern honestly testified to the lack of a claim, to not having spoken to Feerst about filing the Petition, and to the fact that he was rushed into signing the document. Day 5 Tr. 29:24-30:1, 33:22, 34:2.  His testimony is strengthened by that of Feerst, who was unable to testify with any certainty that he spoke to Stern with respect to the Petition. Day 6 Tr. 57:11-13.  Based on these facts, the Court concludes that Stern shall be responsible for 20% of the punitive damage award—$15,000.

### Shteierman and Feerst & Associates

The Court finds that Shteierman and Feerst & Associates should be charged with the majority of the punitive damage award.  First, Shteierman and Feerst appear to have been the moving force behind the filing of the Petition.  Feerst & Associates prepared and filed the Petition on behalf of the Petitioning Creditors. Further, while the Court lacks certain details regarding the

filing of the Petition, the evidence indicates that Shteierman caused and rushed Stern to execute the Petition on the basis that CNG owed Shteierman money—a claim that remains wholly unsupported.

Second, both Shteierman and Feerst & Associates failed to present to the Court any documentary evidence to support their asserted claims.

Third, Shteierman was expressly subject to the state court's Contempt OSC and thus self-interested in halting or stalling the Contempt Hearing to prevent an unfavorable decision finding him in contempt of court and potentially subjecting him to significant monetary sanctions. [35]

Fourth, Shteierman sought to impede the State Court Action and file the Petition for the improper purpose of gaining a disproportionate advantage for himself—to obtain control of CNG for the benefit of himself or Zaitsheck and to the detriment of Fogel.

For these reasons, and the reasons discussed in detail above, the Court finds that Feerst & Associates and Shteierman shall each be responsible for 35% of the punitive damage award—$26,250 each.

---

[35] As attorneys for the plaintiff in the State Court Action, Feerst & Associates also had motivation to stall the Contempt Hearing. While Feerst & Associates was not expressly named as a party subject to potential sanctions in the Contempt OSC, the order provides that the plaintiff, or its attorneys (i.e., Feerst & Associates), appear and show cause why, among other things, an order shouldn't be entered (i) "[p]unishing Plaintiff and more specifically the individual parties alleging to be acting as the Plaintiff company who are named Ari Stern, Adam Kay, David Zaitschek and Yitzchok Shteierman a/k/a Isaac Shteierman and any and all of their representatives, for contempt of, violation of, and noncompliance" with the Access Restoration Order, (ii) "[d]irecting the said Plaintiff's representatives or individuals alleging to be representing the Plaintiff Company Ari Stern, Adam Kay, David Zaitschek and Yitzchok Shteierman a/k/a Isaac Shteierman and any and all of their representatives to pay to Defendant it's attorneys' fees incurred in the making of this motion in an amount not less than $750," and (iii) "[d]irecting the said Plaintiff's representatives or individuals alleging to be representing the Plaintiff company . . . to pay to Defendant $10,000 per day of any violation" of the Access Restoration Order. A/D's Ex. 9 (emphasis added). Not only was the plaintiff or its attorneys required to appear and show cause, but Feerst & Associates arguably could have been considered a representative of the plaintiff or a representative of the individuals alleging to be representing the plaintiff company, and thereby subject to potential sanctions.

III.    Rule 9011 Sanctions

In addition to using the standard set forth in Rule 9011 to determine whether bad faith exists, courts have used Rule 9011 to sanction petitioning creditors and/or their attorneys in cases where an involuntary petition has been filed for an improper purpose and bad faith has been found.[36] *In re Grossinger*, 268 B.R. at 395 ("Sanctions are assessed, and . . . published, to give notice to the bar and future petitioning creditors that sham involuntary petitions may not be filed in this court without consequences."); *In re Kujawa,* No. 89–45120–293, 2000 WL 33954570, at *17 (Bankr. E.D. Mo. June 2, 2000) (recognizing that, in addition to section 303, the court has "other powers to sanction parties" including under Rule 9011).  Rule 9011 grants a bankruptcy court the authority to sanction an attorney, client, or both. *United States v. Int'l Bhd. of Teamsters*, 948 F.2d 1338, 1343–44 (2d Cir.1991) ("Rule 11 subjects the client—'the represented party'—to sanctions even if he has not signed the offending paper." (citing *Oliveri v. Thompson*, 803 F.2d 1265, 1274 (2d Cir.1986), *cert. denied*, 480 U.S. 918 (1987))).

Upon a finding that Rule 9011(b) has been violated, the court has discretion to "impose sanctions upon the offending attorney or party." *In re Parikh*, 508 B.R. 572, 584 (Bankr. E.D.N.Y.

---

[36]  Rule 9011 provides, in pertinent part:

> (b) Representations to the court
>
> By presenting to the court (whether by signing, filing, submitting, or later advocating) a ***petition***, pleading, written motion, or other paper, an attorney or unrepresented party is certifying that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances,
>
> (**1**) ***it is not being presented for any improper purpose***, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation;
>
> […]
>
> (**3**) the allegations and other factual contentions have ***evidentiary support*** or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery; […]

Fed. R. Bankr. P. Rule 9011(b). (emphasis added).

2014) (citing *Perez v. Posse Comitatus*, 373 F.3d 321, 325 (2d Cir. 2004)); Fed. R. Bankr. P. 9011(c). This Court has found that "[i]n determining whether to exercise discretion to impose Rule 9011 sanctions, the Court should be guided by the purposes of Rule 9011 sanctions, which is to 'deter repetition of such conduct or comparable conduct by others similarly situated.'" *In re Parikh*, 508 B.R. at 584 (quoting Fed. R. Bankr. P. 9011(c)(2)).

Generally, a party moving for relief pursuant to Rule 9011 must comply with the safe harbor provision contained in Rule 9011(c)(1)(A). Fed. R. Bankr. P. 9011(c)(1)(A) ("The motion for sanctions may not be filed with or presented to the court unless, within 21 days after service of the motion (or such other period as the court may prescribe), the challenged paper, claim, defense, contention, allegation, or denial is not withdrawn or appropriately corrected . . . ."). This rule, however, does not apply "if the conduct alleged is the filing of a petition in violation of [9011(b)]." *Id.*

While the facts of this case may warrant sanctions against Feerst, and potentially other Petitioning Creditors under Rule 9011(b)(1) and Rule 9011(b)(3), the Alleged Debtor has failed to comply with Rule 9011(c)(1)(A), which requires that "[a] motion for sanctions under this rule ***shall be made separately from other motions or requests*** and shall describe the specific conduct alleged to violate [9011(b)]." Fed. R. Bankr. P. 9011(c)(1)(A) (emphasis added). Because the Alleged Debtor included its request for Rule 9011 relief in its motion seeking dismissal, the Court cannot entertain a sanctions award under that Rule. *See In re Meltzer*, 516 B.R. at 512.

## CONCLUSION

By reason of the foregoing, the Petition is dismissed and the Petitioning Creditors shall pay to the Alleged Debtor $70,456.05 for attorneys' fees and costs.  Punitive damages are assessed in favor of the Alleged Debtor in the amount of $75,000 and are imposed as follows: against Prensky in the amount of $7,500, Stern in the amount of $15,000, Shteierman in the amount of $26,250, and Feerst & Associates in the amount of $26,250.  A separate order will be entered.



**Dated: July 13, 2020**
    **Brooklyn, New York**

                                          **Nancy Hershey Lord**
                                 **United States Bankruptcy Judge**